**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RONNEL ANDRES OVALLES GUERRA,**<br>**Petitioner,**<br><br>**v.**<br><br>**LIVIER ALFONZO APARCEDO, LIVIER APARCEDO, and JOSE ALFONZO,**<br>**Respondents.** | **CIVIL ACTION**<br>**NO. 5:26-04055-JLS** |

**MEMORANDUM**

**SCHMEHL, J. */s/ JLS*** **AUGUST 17, 2026**

Petitioner Ronnel Andres Ovalles Guerra ("Father") filed a Verified Complaint and Petition for Return of Child, seeking the return of A.O.A. ("the child") to Panama. The Court held an evidentiary hearing on July 23, 2026, and the parties submitted briefs and all exhibits intended to be introduced at the hearing beforehand. For the reasons set forth more fully below, the Petition is denied, and the child will not be ordered returned to Panama.

## I. BACKGROUND

Petitioner Father and Respondent Livier Alfonzo Aparcedo ("Mother") are the parents of the child, born on February 9, 2014 in Panama, who is currently 12 years old. *See* ECF No. 1, Petitioner's Verified Complaint and Petition for Return of Child, Ex. D, birth certificate. Father and Mother are both citizens of Venezuela. *See* ECF No. 13, Petitioner's Brief, p. 2. Respondent Livier Aparcedo ("Maternal Grandmother") is the maternal grandmother of the child, and Respondent Jose Alfonzo ("Maternal Grandfather") is the maternal grandfather of the child. *Id.* Mother, Maternal Grandmother, and Maternal Grandfather do not have legal status in the United States. *Id.*

The child is a citizen of Panama. ECF No. 13, p. 3. She currently resides in Easton, Northampton County, Pennsylvania, United States, with Mother, Maternal Grandmother, and Maternal Grandfather. *Id.* Father and Mother met in Venezuela, where Mother became pregnant with the child in 2013. ECF No. 16, Respondent's Brief, p. 2. Shortly after, due to dangerous and difficult conditions in Venezuela, Father moved to Panama to reside with Mother's Uncle who was a Permanent Resident in Panama. *Id.* Mother joined Father in Panama in October 2013. *Id.* Shortly after the Child's birth in February 2014, Mother and Father returned with the Child to Venezuela. *Id.* at pp. 2-3. Shortly thereafter, Mother and Father split and Father returned to Panama. *Id.* at p. 3. After the child became sick in November 2014 and Mother had issues getting medical care, Mother moved her and the Child to Panama, in a separate residence from Father. *Id.*

Father moved to Spain for a short period of time in February 2015, then returned to Venezuela before again residing with Mother in Panama shortly before February 2016. ECF No. 16, p. 3. At that time, the child was sent to Venezuela to stay with family due to financial difficulties the couple faced. *Id.* The child was returned to Mother and Father in November 2016, and they resided together as a family in Panama for about two years. *Id.*; ECF. No 13, p. 3. In 2018, Mother and Father permanently separated, and immediately following the separation, the child primarily resided with Father in Panama, though Mother, who also resided in Panama, had regular contact with the child. ECF. No 13, p. 3. Father moved to Spain in November 2018 and has resided there until recently taking up residence in Panama in May 2026. ECF No. 16, p. 3.

Mother and Father provide conflicting accounts of Father's attempts to maintain regular contact with the child following his move to Spain. *See* ECF No. 13, pp. 3-4; ECF No. 16, p. 3. At some time between 2019 and 2021, either Father or the child's paternal grandmother initiated a family court proceeding in Panama that resulted in a formal custody agreement. *See* ECF No. 13,

pp. 3-4; ECF No. 16, p. 3. The child would continue to reside in Panama with Mother, and Father would have regular visitation and contact with the child under the agreement. ECF No. 13, p. 4.

In December 2020, an email from Father to Mother indicates Father had signed the necessary travel documents to permit the child to travel with Mother to the United States to see Maternal Grandparents. ECF No. 16, p. 3; *see* ECF No. 17-1, Respondent's Corrected Exhibits, Ex. D-7. Mother and Child came to the United States in January 2021 on visitor visas. ECF No. 16, p. 3. During their visit, the opportunity to obtain Temporary Protected Status ("TPS") as citizens of Venezuela arose, and Mother obtained that status for herself and the child. *Id.*, pp. 3-4. Father alleges he did not consent to the child obtaining TPS, but after she had, he extended his authorization for the child to continue to stay in the United States. ECF No. 13, pp. 4-5.

Numerous emails show Father inquiring about the status of the Child's TPS application, asking whether he needs to do anything other than pay the fee, and providing advice on how to get their applications to move faster. ECF No. 16, p. 4; *see* ECF No. 17-1, Ex. D-7. Father also communicated that he has allowed Mother and the child to remain here in the United States because he knows it allows for them to have a better future. *Id.*

Father is now a citizen of Spain where he resides with his wife and owns property and businesses. ECF No. 16, p. 2. The custody order out of Panama allows Father one month of visitation in Spain each year and regular contact with the child, among other custodial rights. ECF No. 13, p. 7. Because Father believed he was unable to effectively enforce his custodial rights under the Panamanian custody order, he initiated a custody action in the Northampton County Court of Common Pleas in Pennsylvania in January 2025. *Id.*; ECF No. 16, p. 4. Later that year, on November 7, 2025, the child's TPS was terminated. ECF No. 13, p. 5.

After a custody trial was held in the Northampton County Court of Common Pleas, a custody order was entered granting the parties shared legal custody, with Mother having primary physical custody subject to Father's periods of partial physical custody. ECF No. 16, p. 5; ECF No. 13, p. 7. During the custody proceedings, Father has asked to be able to do his visitation in Spain and has repeatedly been denied by the Court. ECF No. 16, p. 4. All of Father's visits with the child have taken place where the child has lived, whether that be Panama when Mother resided there or here in the United States where Mother now resides. *Id.*

In November of 2025, after learning the child's TPS had been terminated, Father filed a Special Relief Petition in the Northampton County Court of Common Pleas asking for sole legal and sole physical custody due to the immigration issue. ECF No. 16, p. 5. The Court denied the Special Relief Petition but ordered Mother to provide Father's counsel with proof that she was applying for a new legal status, which she did. *Id.* Thereafter, Father indicated he did not consent to the F-1 and F-2 visa applications Mother had submitted, even though the F-2 is simply a dependency status, and Father's consent is not required for Mother to obtain it, as it comes with her visa. *Id.* Father then filed another Special Relief Petition as well as a Petition for Modification that were heard on November 20, 2025. *Id.* The Special Relief was again denied. *Id.*

After another trial, the current custody order was entered in February of 2026. ECF No. 16, p. 6. Father's periods of custody are the entire month of July, December 26-December 31, and with fourteen (14) days notice he can have an additional ten (10) days visitation. *Id.* All visitation must be done in the United States. *Id.* The Northampton County Custody action is stayed pending a resolution of this action. ECF No. 13, p. 7.

Father has repeatedly requested that the child be allowed to get Spanish citizenship since he is now a Spanish citizen, lives in Spain, owns and runs a business in Spain, and has family in

Spain. ECF No. 16, p. 6; *see* ECF No. 17-1, Ex. D-7. As recently as April 20, 2026, Father requested Mother's authorization to begin the process of obtaining Spanish citizenship for the child. *See* ECF No. 17-1, Ex. D-7. Father took up residence in Panama and began to allege that he resides in Panama in May of 2026, shortly before initiating the present action. ECF No. 16, p. 6.

Father filed his Hague Convention application with the Ministry of Foreign Affairs, the Central Authority for Panama on June 3, 2026, which the Central Authority thereafter forwarded to the United States Department of State, the United States Central Authority. ECF No. 13, p. 5. Father emphasizes his concern that the child faces the serious risk of potential deportation by U.S. authorities due to her immigration status, and given this fear, Father argues the requested relief is necessary to prevent imminent physical, emotional, and psychological danger to the child. *Id.,* pp. 7-8.

At the July 23, 2026 evidentiary hearing held by this Court, Father testified that he revoked his consent for the child to remain in the United States after she lost her TPS in November of 2025, and therefore that is when the alleged wrongful retention under the Hague Convention began. However, Father also testified that he would have initiated this action regardless of the child's legal status. He further testified that he intended to stay in Panama with the child if the Petition were granted, rather than use the fact that the custody order out of Panama allows visitation in Spain to take the child to Spain. While Father's intentions and tactics are questionable, his concern for the child seems to be genuine and consistent. The Petition will be denied, however, because the Court does not find that Mother's retention of the child in the United States is wrongful, as explained below.

## II. LEGAL STANDARD UNDER THE HAGUE CONVENTION

The Hague Convention is a multilateral treaty on parental kidnapping to which the United States and Panama are members. The purposes of the Hague Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure the rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25, 1980, T.I.A.S. No. 11,670 ("Hague Convention"). The International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq., implements this nation's obligations under the Convention.

The Hague Convention was "not designed to resolve international custody disputes." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). When adjudicating Hague Convention petitions, courts are limited "to restor[ing] the status quo prior to any wrongful removal or retention, and to deter[ring] parents from engaging in international forum shopping in custody cases." *Id.*; *see also Didon*, 838 F.3d at 320 (explaining that any return remedy merely "seeks to restore the status quo that existed prior to the wrongful ... retention" (internal quotation marks omitted)).

A petitioner who initiates judicial proceedings for the return of a child under the Hague Convention has the burden to prove, by a preponderance of the evidence, that the child has been wrongfully removed or retained. 22 U.S.C. § 9003(b), (e)(1)(A). The removal or retention of a child is wrongful if 1) it is in breach of rights of custody attributed to a person ... under the law of the State in which the child is habitually resident immediately before the removal or retention; and 2) at the time of removal or retention those rights were actually exercised ... or would have been so

exercised but for the removal or retention. Hague Convention, *supra*, art. 3; *Blackledge v. Blackledge*, 866 F.3d 169, 177 (3d Cir. 2017).

The Third Circuit has explained that, to determine if a petitioner is entitled to relief, the court must answer four questions: “(1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention.” *Yang v. Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (citing *Karkkainen*, 445 F.3d at 287).

## III. ANALYSIS

Although Father attempts to argue that both a wrongful removal and a wrongful retention have taken place, the evidence shows that he offered substantial consent and cooperation in the years following the child’s removal to the United States and only began to argue that his rights under the Panama custody order were being infringed after the child had lived in the United States for a considerable amount of time. Therefore, this Petition is properly construed as alleging wrongful retention, and the child’s habitual residence immediately prior to the retention, rather than the removal, must be ascertained.

In *Blackledge*, the Third Circuit held “that the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof.” 866 F.3d at 179. Here, Father clearly and unequivocally revoked his consent to the child’s continued habitation in the United States when he filed the Special Relief Petition on November 5, 2025 asking for sole legal and physical custody of

the child due to the termination of her TPS in the Northampton County Court of Common Pleas proceedings.

The Hague Convention does not define habitual residence, but the Third Circuit has held that it's "a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case." *Karkkainen*, 445 F.3d at 291. The inquiry is more challenging where "the petitioning parent initially agreed to allow the child to stay abroad for an indefinite duration, but subsequently had second thoughts about that decision." *Id.* A child's habitual residence is "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Feder*, 63 F.3d at 224). This analysis requires a court to analyze both the child's acclimatization and the "shared parental intent" "regarding their child's presence in a particular place." *Blackledge*, 866 F.3d at 180 (quoting *Karkkainen*, 445 F.3d at 292, 296).

Generally, "courts will find no change in habitual residence" where the evidence of shared parental intent demonstrates the "child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration." *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004). The Third Circuit, however, recognizes an exception to this general rule where a move, though temporary, carries "a degree of settled purpose ..., even if such purpose is only for a limited period." *Blackledge*, 866 F.3d at 180 (quoting *Whiting*, 391 F.3d at 549). "All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Feder*, 63 F.3d at 223-24.

The relative weight assigned to the parents' shared intent and the child's acclimatization depends on the child's age. *See Blackledge,* 866 F.3d at 180-81. Once a child is old enough "to

develop a certain routine and acquire a sense of environmental normalcy," acclimatization becomes the central inquiry. *Whiting*, 391 F.3d at 550-51. The *Whiting* Court recognized that a typical four-year-old child "certainly has this ability" and is "able to form meaningful connections with the people and places he encounters each day." *Id.*

In this case, the child was moved between Venezuela and Panama quite a bit in her first years of life. Since Father moved to Spain in 2018, the child has primarily lived with Mother, and since moving to the United States in 2021, she has resided in Easton, Pennsylvania with Mother and Maternal Grandparents. When the child left Panama, she was almost 7 years old, and she is now 12 years old. Immediately prior to the retention date, the child was 11 years old and had been living in Easton for over four and a half years.

Although Father insists he never consented to the child staying in the United States for an indefinite duration and always expected the child would eventually be returned to Panama, during the evidentiary hearing he conceded there is no proof that Mother ever said she would take the child back to Panama or intended for the stay to be temporary. The evidence shows Father consented to the Child traveling to the United States as well as remaining in the United States, even if he did initially lack awareness of Mother's intention to remain. Even if there was evidence of shared parental intent that the child's stay in the United States would be temporary, which there is not, after four and a half years her relocation to the United States carried a degree of settled purpose. Father's assistance in obtaining TPS for the child also supports a finding that, for a significant period of time, there was a shared parental intent that the child remain in the United States for a substantial amount of time.

Further, as she is 12 years old, the child's acclimatization is due greater weight than that due to the parents' shared intent. She is currently enrolled in school and has been since arriving in

the US. ECF No. 16, p. 17. She has gone through ESL programs at school to learn English and has been so successful that she no longer needs ESL support. *Id.* She has worked hard in school, entered the Gifted program, and learned to play the violin. *Id.* The child participates in camps during the summer. *Id.*

During the evidentiary hearing, the child testified that she would like to stay in Easton, because she has many friends here and enjoys participating in various community activities. She said she doesn't remember Panama very well or keep in touch with anyone there. Although the date of retention occurred when she was 11 years old, approximately eight months before her testimony was given, her answers are unlikely to have changed substantively from those she would have provided then. After over four and a half years in Easton, she likely already felt well settled immediately prior to November 2025. Therefore, the Court finds the child was acclimatized to the United States at the time of retention.

## IV. CONCLUSION

Because the parents' shared intent, for a significant period of time, was for the child to remain in the United States with a "degree of settled purpose," *Whiting*, 391 F.3d at 549, and the child had acclimatized to the United States by the date of retention, the United States was the child's habitual residence immediately prior to the retention date. The retention did not breach Father's custody rights under the law of the child's habitual residence, as Father is able to exercise his rights under the current custody order entered in February 2026 Northampton County Custody action. The Petition is therefore denied.